716 P.2d 1260

**Jack L. BOPP, Plaintiff-Appellant,**

v.

**CITY OF SANDPOINT and Cedar Street Bridge Company, Defendants-Respondents.**

No. 15496.

Supreme Court of Idaho.

Feb. 19, 1986.

Rehearing Denied April 22, 1986.

Bruce H. Greene, of Greene & Greene, Sandpoint, for plaintiff-appellant.

Michael C. Moore, Spokane, Wash., and Charlton Mills, Sandpoint, for defendant-respondent Cedar Street Bridge Co.

Philip H. Robinson, of Robinson, Vogel & Hunt, Sandpoint, for defendant-respondent City of Sandpoint.

BAKES, Justice.

In this the second of two lawsuits arising from the construction of a shopping mall on the Cedar Street Bridge in Sandpoint, Idaho, Jack L. Bopp sues the City of Sandpoint (city), contending that the city's ordinance vacating the public right-of-way in the Cedar Street Bridge and subsequent lease of the underlying property to the

Cedar Street Bridge Company (company) are void. The company, joined by the city, moved for and was granted summary judgment. The district court held, in sum, that Bopp had failed to state a cause of action both with regard to the vacation ordinance and the subsequent lease. We affirm the district court.

The dispute in this case centers around certain real property deeded to the city in fee simple in 1908. The property is an 80-foot wide strip of land which commences at the intersection of Cedar Street and Sand Creek in Sandpoint, Idaho, and then crosses to the east side of Sand Creek. In 1908–09, the city constructed a wood bridge known as the Cedar Street Bridge on the property. The bridge connected Cedar Street in the downtown business district of Sandpoint to the Burlington Northern Railroad depot and other property on the east side of Sand Creek. In 1969 the bridge was closed to vehicular traffic due to its deteriorating condition. Over the passage of time the bridge deteriorated even further. In 1978 the city council initially voted to demolish the bridge and a few days later voted to repair it instead. Repairs were never made due to lack of money. On April 28, 1980, for public safety reasons, the mayor ordered the bridge barricaded, even to pedestrian traffic.

In June, 1980, the city council adopted resolution No. 19–80, authorizing the execution of an option to lease the bridge property to Scott Glickenhaus. (Glickenhaus is the general partner in the respondent company.) The following October the city entered into a formal lease (first lease) of the property with the company. Bopp challenged this lease in his first lawsuit against the city in district court and prevailed on his motion for summary judgment. The district court held the first lease void because, among other reasons, no formal action had been taken by the city to vacate the property as public right-of-way, and that the resolution authorizing the lease did not contain a determination that the property was not needed for city purposes. The district court's judgment in this first lawsuit was entered on September 23, 1982. It was not appealed. Shortly thereafter the city sought to remedy the faults found by the district court.

On October 12, 1982, at a special meeting of the Sandpoint City Council, a motion was adopted to commence proceedings to vacate the bridge right-of-way. A public hearing on the proposed vacation was held two weeks later, on October 28, 1982, after notice of the hearing was published twice in each of the local newspapers. On November 8, the Sandpoint City Council and the mayor approved Ordinance No. 767 declaring the bridge unnecessary for city purposes and vacating the public right-of-way portion of the bridge. (The ordinance claimed that the public's right-of-way was only a 32-foot wide strip inside the city's 80-foot ownership strip spanning Sand Creek.) Eight days later, on November 16, 1982, the city council adopted resolution No. 52–82 which declared that the real property in question (the entire 80 feet), owned in fee simple by the city, was not needed for public purposes and authorized a lease of that portion of the property to respondent Cedar Street Bridge Company. The resolution also found that the terms of the lease were just and equitable.[1] The lease (second lease) was executed that same day.

Bopp commenced the present action in the district court on December 20, 1982, seeking both declaratory judgment and equitable relief from the city's actions in vacating the bridge and thereafter leasing it to the company. In essence, Bopp again seeks to have the lease declared void on grounds that: (1) the vacation ordinance is invalid; and (2) the terms of the lease are neither just nor equitable as required by I.C. § 50–1409.

I

We first address the issue of whether Bopp, who does not own any property adja-

---

1. The initial term of the lease is 40 years with an option to renew for 59 years. Annual rent payments are one dollar, plus a percentage of the receipts.

cent to the right-of-way being vacated, may nevertheless contest the validity of the vacation ordinance. This Court early on, in *Canady v. Coeur d'Alene Lumber Co.*, 21 Idaho 77, 120 P. 830 (1911), held that "a property owner has no cause of action against a municipality for damages to his or her property by the vacation of a public highway, where no part of his property abuts upon the portion of the highway vacated ..." (with two exceptions, neither of which are applicable here). *Canady v. Coeur d'Alene Lumber Co.*, 21 Idaho at 91, 120 P. at 834. The Court in *Canady* relied on the earlier case of *Stricker v. Hillis*, 17 Idaho 646, 106 P. 1128 (1910), in which the Court held that in order to have a claim a property owner must suffer a loss not common to the public.

In this case if the appellant Bopp can be said to have suffered some injury, it is one which is not special or peculiar to him; rather, it is one generally shared by all residents of the City of Sandpoint alike. The district court correctly applied the general rule "that only those who sustain some special or peculiar injury, differing in kind and not merely in degree from that sustained by the general public, are entitled to complain of a street vacation."

Appellant alleges that even if his injury is one which is shared generally by all residents of the city, he may nevertheless state a cause of action against the city under our mandamus and prohibition statutes. The district court held that appellant's failure to specifically pray for the issuance of such writs constitute a basis for denying any relief under said statutes. However, we affirm the trial court because writs of mandate (and their counterpart, prohibition) will not issue to compel the performance of a purely discretionary function, *Dalton v. Idaho Dairy Products Com'n*, 107 Idaho 6, 684 P.2d 983 (1984);

*Lisher v. City and/or Village of Potlatch*, 101 Idaho 343, 612 P.2d 1190 (1980); *Saviers v. Richey*, 96 Idaho 413, 529 P.2d 1285 (1974), vacation of streets under I.C. § 50–311 being such a discretionary function. Appellant's arguments regarding mandamus and prohibition, therefore, are without merit.

Appellant also argues that the *Canady* decision should be held inapplicable to his proceeding for relief under our declaratory judgment statute because *Canady* was decided prior to the enactment of the declaratory judgment statute. Appellant argues that the declaratory judgment provision is much broader in its scope as to those interests cognizable in courts of justice. Again, appellant argues that in a proceeding for declaratory judgment he need not allege some injury special or peculiar to himself. We disagree. In *Greer v. Lewiston Golf & Country Club, Inc.*, 81 Idaho 393, 342 P.2d 719 (1959), we specifically held that a taxpayer suit challenging the validity of a statute or municipal ordinance must allege an interest other than "such as is common to all other like-situated taxpayers...." *Greer v. Lewiston Golf & Country Club, Inc.*, 81 Idaho at 397, 342 P.2d at 722.

Accordingly, the district court did not err in dismissing Bopp's claim challenging the validity of the vacation ordinance. Likewise, the district court correctly concluded that Bopp may not challenge the ordinance indirectly *via* a challenge of the lease. Thus, to the extent appellant challenges the lease based on the validity of the vacation ordinance, he likewise fails to establish a cause of action.[2]

## II

The only other grounds advanced by appellant regarding the validity of the

---

**2.** One of the alleged grounds, advanced by appellant for holding the second lease void, is that it is premised on the arbitrary and false determination by the city that the property is no longer needed for public purposes. This alleged basis for the lease's invalidity is nothing more than a veiled attack on the vacation ordinance itself. Inherent in any street or bridge vacation is the requisite finding that the property is no longer needed for public purposes. Thus, to permit appellant to assail the lease on this basis would be to effectively permit an attack on the vacation ordinance itself.

lease concern the adequacy of the terms. I.C. § 50–1409 permits a municipality to lease city property "not needed for city purposes, upon such terms as may be just and equitable." This power to lease is a purely discretionary function entrusted to the elected officials of the municipality and, absent a clear abuse of that discretion, any decision made thereunder will not be overturned on appeal. *Larsen v. Village of Lava Hot Springs*, 88 Idaho 64, 396 P.2d 471 (1964); *Moore v. Village of Ashton*, 36 Idaho 485, 211 P. 1082 (1922) (courts may not inquire into motives behind legislative enactments or resolutions except as to acts which are purely ministerial). Thus, absent allegation by appellant of any "glaring informality or illegality in the proceedings," *Canady*, 21 Idaho at 88, 120 P. at 833, relating to the resolution approving the lease, we will not disturb the city's determination that the terms of the lease are just and equitable. Our review of the record fails to disclose any such allegations by appellant. As a result, we conclude that appellant has likewise failed to state a cause of action relating to the validity of the lease.

The decision of the district court is affirmed. Costs to respondents. No attorney fees.

DONALDSON, C.J., and SHEPARD, J., concur.

HUNTLEY, J., concurs in result.

BISTLINE, Justice, dissenting.

### I

If counsel for the parties and the district judge on reading the majority opinion recognize that it is the same case with which they wrestled, it will be a welcome surprise. The court below did not rule that the plaintiffs had failed to plead a cause of action, but rather ruled that the plaintiff was *without standing* to maintain the action. "The Court will first address the ·claim that Plaintiff does not have standing

to maintain this action." R., Vol. 2, p. 245. Relying almost entirely on *Canady v. Coeur d'Alene Lumber Co.*, 21 Idaho 77, 120 P. 830 (1911), which the trial court thoroughly discussed and declared itself bound by, R., Vol. 2, p. 250, 1. 20, the conclusion was reached that "the Plaintiff does not have standing upon which to assert his case against the City regarding Ordinance 767." *Id.* The conclusion was based upon language in *Canady* believed to impose the absolute requirement that absent being an abutting owner plaintiff had no standing.

At p. 251 of the record, Vol. 2, the district court disposed of plaintiff's contention that as a resident and taxpayer of the city he had standing, writing that it was insufficient that plaintiff had a "generalized public-spirited interest in the enforcement of its laws." *Green v. Lewiston Golf Club* was relied upon.

Although the plaintiff's trial brief contained cases supporting his contention of entitlement to the extraordinary relief affordable by writs of mandate or prohibition, the trial court ruled that the failure to pray for relief thereunder "shall constitute the basis for their rejection." R., Vol. 2, p. 251.

On plaintiff's contention as to reversionary rights where the ordinance vacated the "public right-of-way underlying Cedar Street Bridge," again the trial court held that plaintiff, as a non-abutting owner, had no standing. *Id.* at 252.

On plaintiff's challenge to the leasing of city property, again the trial court concluded "that Plaintiff does not have the requisite standing." This was said to follow from the ruling that an attack on the lease was a collateral attack on the ordinance vacating the public right-of-way. "Plaintiff should not be allowed to do indirectly that which he does not have the requisite standing to do directly." *Id.*[1]

Although much of the record in the prior case, Civil No. 20044, is in this record, the pleadings do not seem to be. We do have the benefit of the district court's (The Hon-

---

1. I am totally at a loss to follow the logic in this statement. Had the property subject to the lease been acquired by an outright fee purchase by the city, whether as city property being perhaps subject to an illegal lease would have no bearing on the standing issue.

orable Watt E. Prather) memorandum decision in the first case; from the fact that in his very thorough discussion of the issues presented, R., Vol. 2, pp. 376–95, no mention is made of any "standing" issue, presumably that defense was not raised in that prior action. In this case it was, and it was on that basis that the trial court granted a summary judgment to the defendants. Appellate review should have started with an analysis of that decision, as viewed against the plaintiff's contentions. Instead, however, Justice Bakes, in authoring the majority opinion, commences it with *his own* application of *Canady* as he reads it. If his understanding of the holding of *Canady* is in error, then the majority opinion cannot stand as written.

The majority opinion is indeed guilty of placing too much reliance on *Canady v. Coeur d'Alene Lumber Co.*, 21 Idaho 77, 120 P. 830 (1911). True, there is a *discussion* in that opinion as to the rights of a non-abutting owner to *damages*, together with a recitation of cases from other jurisdictions, and a statement of a general principle with two exceptions, as to there being no cause of action in such non-abutting owner. *Id.* at 88–93, 120 P. at 832–835. The only clear true holding in *Canady* is at the close of the opinion where the Court held against Mrs. Canady on the basis of limitations, but in language equally appropriate to laches and estoppel:

It is next contended that appellant's cause of action, if she had one, was barred by the statute of limitations, subd. 1 of sec. 4054 and secs. 4037, 4038 and 4060, Rev. Codes. We think *under the facts of this case that this action is barred by the statue of limitations*, and that this action should have been brought at least within five years from the date such cause of action arose. We think it sufficiently appears that appellant sat by when ordinances Nos. 71 and 75 were passed in 1900, and more than nine years before this action was com-

menced, and made no complaint of any damages having been sustained to her property by reason of said ordinances and the vacation of the streets. And again in 1905 when ordinance No. 115 was passed she made no protest or objection of any kind. She knew that the Coeur d'Alene Lumber Co. was expending a great deal of money in establishing its lumber plant upon said blocks and portion of one of the streets, and made no protest of any kind whatever to the city and made no claim for damages to her property as resulting from the passage of said ordinances. The first time she complained of damage to her property, so far as the record shows, was when she commenced this action June 15, 1909. (*Howard Co. v. Chicago & A.R. Co.*, 130 Mo. 652, 32 S.W. 651; *City of Logansport v. Uhl*, 99 Ind. 531, 49 Am.Rep. 109.)

We therefore conclude that the court did not err in granting a nonsuit at the close of plaintiff's evidence and entering a judgment of dismissal. *Id.* at 93, 120 P. at 835 (emphasis added).

On just a cursory examination of the *Canady* opinion, that such was indeed the holding is quickly learned by that Court's statement of the issues raised by the answers to Mrs. Canady's [2] complaint:

The defendant filed separate answers in which they denied that plaintiff was in any way damaged by said streets and alleys being vacated; denied that plaintiff's land was at the time of the passage of said ordinance within the limits of said city, and *also plead the statute of limitations and an estoppel*.

Upon the issues thus made by the pleadings, at the close of plaintiff's evidence a nonsuit was granted on motion of the defendants, who are respondents here, and judgment of dismissal was entered. A motion for a new trial was denied and the appeal is from the judg-

---

**2.** The interested North Idaho reader might want to know that Mrs. Canady's husband, from whom the property passed to her, was Tony A. Tubbs, and the property involved lies at the bottom of Tubbs Hill, and perhaps the railroad tracks then in question are today at the same location.

ment and said order. *Id.* at 85, 120 P. at 832 (emphasis added).

At an early point in its opinion, the *Canady* Court reached the *ratio decidendi* which resulted in its holdings and judgment:

Conceding that said Tubbs' Addition was a part of the town, village or city of Coeur d'Alene at the dates said ordinances were passed, the question is directly presented whether the plaintiff, under the facts of this case, can recover in this action. *Two of said ordinances were passed in the year 1900, about nine years before this action was commenced,* and after the lumber company was proceeding with its operations in establishing its plant and manufacturing lumber and had established on said blocks Y, Z and Shore and on parts of the streets so vacated an extensive and costly lumber plant *more than five years prior to the commencement of this action,* and without objection from appellant, she having actual notice of the enactment of said ordinances and of the erection of said plant, as a sawmill had been operated on said blocks Y, and Z since 1891. It is evident that *an opening of said streets would now result in almost if not a total destruction of said lumber manufacturing plant,* which was erected with the knowledge, permission and consent of the city, under and by virtue of the permission granted by said ordinances. Under the facts of this case appellant should have acted promptly if she considered that her rights were invaded by the passage of said ordinances and the erection of said sawmill, planing-mill, etc., and not stood passively by and permitted such a large expenditure of money and made no objection to the closing and vacating of said streets and alleys. *Id.* at 85–86, 120 P. at 832 (emphasis added).

From that point on to page 93, 120 P. 830, the Court's opinion was mere *obiter dicta,* not necessary to its decision. Simplistically stated, where it is concluded that an action was barred by a statute of limitations, it is inescapable that anything else added is wholly gratuitous.

*Canady* and the cases upon which it relied all involved a plaintiff seeking *monetary* damages. This fact taken alone is a marked distinction between those cases and this case because here plaintiff is seeking only declaratory and equitable relief, and *not* monetary damages.

Reliance on the gratuitous dicta in *Canady* is less than wise, especially where no current analysis of the case law found in *Canady* is attempted. *Canady's* antiquity is highlighted by its reliance upon even more ancient cases, one of which is now 149 years old. Discussions of standing in *Canady* and cases cited therein should hardly command any deference today, and for certain, not blind deference without any concern for the present state of the law.

*Canady* itself has been cited to *but four times* since it was written. *Alexander v. Trustees of Village of Middleton,* 92 Idaho 823, 825–26, 452 P.2d 50, 52–53 (1969); *Hillman v. City of Pocatello,* 74 Idaho 69, 72, 256 P.2d 1072, 1073 (1953); *Continental Oil Co. v. City of Twin Falls,* 49 Idaho 89, 102, 286 P. 353, 359 (1930); and *Thomas v. Boise City,* 25 Idaho 522, 533, 536, 138 P. 1110, 1115 (1914). But in none of those four cases was *Canady* relied upon for what was purely a gratuitous dissertation on standing. In three of the cases— *Alexander, Hillman,* and *Continental Oil Co., Canady* was discussed in terms of its estoppel *holding.* Today the majority applies its discussion of standing for the very first time ever—74 years having gone by since *Canady.*

The majority also relies upon *Greer v. Lewiston Golf & Country Club, Inc.,* 81 Idaho 393, 395–96, 342 P.2d 719, 721 (1959), to support its holding that plaintiff is without standing. The majority cites *Greer* for the rule that "a taxpayer suit challenging the validity of a statute or municipal ordinance must allege an interest other than such as is common to all other like-situated taxpayers...." Slip op., p. 1262 *quoting Greer, supra,* 81 Idaho at 397, 342 P.2d at 722. The majority would do better to make a closer examination of *Greer.* Justice

Bakes, I muchly fear, has taken great literary license when he composed the sentence in which he quotes from *Greer*, 81 Idaho at 397, 342 P.2d 719, righthand column, beginning eight lines from the bottom of the page—which additional direction is added because of my own extreme difficulty in finding what the Justice avers "we specifically held" in that case. The Court in *Greer* was merely observing what nine other courts in other jurisdictions had held. *Greer* presents no problem to this plaintiff's action. True, standing was an issue in that case. Equally true, the *Canady* case went wholly unmentioned in the Court's opinion, nor did any of the Idaho cases cited in the Court's opinion. The true holding of the case by which the appeal was disposed of is found in the final paragraph:

> The *insignificant increase n plaintiff's tax burden,* due to the loss of taxes and license fees by reason of the ordinance, *is not sufficient to establish their right to maintain this action. Moreover, their remedy by way of referendum, as provided by the charter and ordinance in question, was adequate and complete. Greer, supra,* 81 Idaho at 398, 342 P.2d at 722 (emphasis added).

What should have commanded the attention of the majority in its reading of *Greer*, a case which dates back in time a quarter of a century, was that the Court saw fit to include a passage from then current C.J.S. which showed a then trend in the law—one which would and did grow and grow:

> "Thus, a taxpayer does not, as such, have the right to maintain an action for a declaratory judgment as to a statute or ordinance where his personal rights are not involved and cannot be affected, at least where the expenditure of funds is not involved. However, it has been held that a taxpayer may, at least in some circumstances, be entitled to seek declaratory relief with respect to determining the validity of a statute or ordinance, as where he has a real interest distinct from that of the public generally, or where a substantial expenditure or substantial waste of public funds is involved." 26

C.J.S. Declaratory Judgments § 118, pp. 270–271. *Id.* at 396, 342 P.2d at 721.

In the intervening 25 years since *Greer*, how has that trend observed in *Greer* progressed? Just a cursory and rapid review of the law establishes an expansion of the trend to allow residents and taxpayers to prosecute suits challenging city actions. *See, e.g., State v. Weidner*, 684 P.2d 103, 110 (Alaska 1984) (Local property owners within area of land to be disposed of through agricultural land lottery had sufficient personal stake in outcome of the controversy to have standing.); *Board of County Commissioners of Riley County v. City of Junction City*, 233 Kan. 947, 667 P.2d 868, 871 (1983) (Individual land owners of land in county had standing to seek a declaration as to constitutionality of ordinance annexing certain lands in county to city.); *Conrad v. City and County of Denver*, 656 P.2d 662 (Colo.1982) (Plaintiffs' economic interest in having their tax dollars spent constitutionally is sufficient to grant them standing.); *State ex rel. Wenzel v. Murray*, 178 Mont. 441, 585 P.2d 633, 638 (1978) (Property owner had standing to sue to prevent waste of public money.); *Clark County v. City of Las Vegas*, 94 Nev. 74, 574 P.2d 1013, 1014 (1978) (Individual taxpayers had standing to maintain action challenging constitutionality of statute creating metropolitan fire departments.).

It has been observed that on occasion, depending oft-time on the author, in the early years the opinions did sometimes exhibit a tendency to extend beyond the holding. Another such a case was *Village of Sand Point v. Doyle*, 11 Idaho 642, 83 P. 598 (1905). As in *Canady*, the Court said considerably more than necessary before it finally concluded, "We think the demurrer should have been overruled." *Id.* at 651, 83 P. at 601.

As shown at p. 79 of 21 Idaho 120 P. 830, Mrs. Canady's counsel relied upon the then recent case of *Village of Sandpoint v. Doyle*, 14 Idaho 749, 95 P. 945 (1908). That case involved the other bridge in downtown

Sandpoint which crossed over Sand Creek. In this second action, Justice Ailshie, in writing for the Court, was confronted with too much that had been said by the Court on the first appeal, and felt obliged to explain why it was mostly gratuity unnecessary to the question presented:

> Upon a casual reading of this language, it might be taken to indicate the view of the court that the municipality could absolutely prohibit the construction of any kind of a building, whether lawful within itself or not, and whether intended for use in a lawful and legitimate business or otherwise. In order to ascertain, however, the real purpose and intent of the court, *it is necessary to ascertain the exact question that was before the court* and that was then being discussed and considered by the court, and out of the consideration of which the use of this language arose. The question there being considered was the right of Doyle to maintain a nuisance on his property adjacent to this bridge, and particularly the power of a court of equity to restrain him from carrying on a business within a district where the same was prohibited and forbidden by a municipal ordinance and to maintain a nuisance on and adjacent to this bridge. The court held that notwithstanding the right of the municipality to have Doyle repeatedly arrested for violating the ordinance, that it might also invoke the aid of a court of equity to restrain him from maintaining the building and offensive business at the place and in the manner it was maintained, and wherein the offense and violation was being repeatedly committed. The question was not before the court, on that appeal, of the power of the municipal authorities to absolutely prohibit the construction of any building whatever at that place or the maintaining and carrying on of any lawful and legitimate business on the property in ques *The decision rendered by this court on the former appeal is unquestionably the law of the case upon all matters that were involved in, presented and passed upon on that appeal. It determines the right*

*of the municipality to restrain and enjoin the appellant in this case from maintaining a saloon or conducting a saloon business on this property. Beyond that,* however, *we do not think anything said in that opinion can be treated as the law of the case.* 14 Idaho at 755, 95 P. at 946–947 (emphasis added).

The reader to this point will find that Justice Ailshie at that early time recognized the bent for superfluity, which is only academically interesting.

But, after getting the opinion in the first case out of the way, Justice Ailshie got into the issue presented on the second appeal, and some of which is pertinent to varying degrees:

> [W]e must remember that respondent's lot abuts on one of the streets and thoroughfares of the appellant corporation. *It must also be borne in mind that the bridge along and over this street is a part of the street. In other words, a bridge is a highway.* (Sec. 850, Rev. Stat.; Elliott on Roads and Streets, 2d ed. sec. 27.) If the village had not seen fit to construct this bridge across Sand creek and the ravine and depression through which it flows, but had rather preferred to leave the street as it previously was on the surface of the ground, there could be no question of the right of Doyle to construct his building, under proper regulations, and maintain the same on his lot and fronting on this street with all the necessary privileges of ingress and egress through and over the street. But the village saw fit to raise the surface of the street, which it might have done by a fill until it came to the main channel of the stream; or as it did do, by erecting posts and building a platform or bridge at the grade and level to which it desired to raise the surface of the street. Now, the village having seen fit to raise the surface of its easement and right of way for street purposes to an elevation of 20 feet in front of Doyle's property, has he not an equal right to raise his building to the same elevation

so as to preserve his right of ingress and egress? If he can do so, he is clearly within his legal rights. If he cannot, then the village by raising the grade of its street, through the guise and name of a bridge, may improve Doyle out of his property and all right of use and benefit thereof. This is certainly not justice, and we do not think it is the law. Every citizen has an equal right with every other to travel the streets of this municipality; but, on the contrary, every property owner having a lot abutting on a street or thoroughfare has a special and peculiar right in that particular street not common to the other citizens. That right is a property right appurtenant to his lot, and furnishes him the means of getting to and from his property and thereby enjoying the common right of all the streets with the balance of the citizens of the community. If he cannot get out from his property and has no means of ingress or egress, then the streets and thoroughfares of the municipality will be of no use to him. *While the public generally may have no special or particular interest in the right of ingress to any particular lot owner's property, the lot owner has a very material and special interest in having the public reach his property and place of business,* and in his right to go and come and carry on business and invite the public to his place of business. *Id.* at 756–57, 95 P. at 947 (emphasis added).

If today's majority were to put *Canady* aside it would be hardpressed to find a justifiable reason for holding the plaintiff powerless to challenge the city's actions. Unlike Mrs. Canady, the plaintiff in this action moved with alacrity and in fact was successful in his first action, as the majority does note.

As to the mandamus and prohibition discussion by the majority, again I am as unimpressed as by misplaced reliance on *Canady.* First, the majority, after observing that the district court held that "failure to specifically pray for the issuance of such writs constitutes a basis for denying any relief ...," does not tell the reader whether

such was or was not error. Instead, the majority itself supplies the answer by saying that such writs will not be used to compel the performance of a purely discretionary function. The plaintiff's arguments are then said to be without merit. It seems more likely that the majority opinion will seem to some readers to be lacking in merit. Appellant's only citation of authority for its statement that the courts are powerless to compel the performance of a purely *ministerial* function is I.C. § 50–311. On ten or more readings of that section, I am unable to discern any language which gives carte blanche unquestionable and arbitrary discretion to a city in exercising the empowering provisions and procedures therein contained. My reading of *Johnston v. Boise City,* 87 Idaho 44, 390 P.2d 291 (1964) establishes the principle that discretionary acts that transgress the bounds of reasonableness are very much a concern of the courts. The action in that case was for injunctive relief. A unanimous court, per Justice McFadden, held there as applicable here:

> If the enactment authorizing the exercise of the authority bears a reasonable relationship to the public health, safety, morals or general welfare, such enactment would be valid within the inherent powers of the legislative body. *White v. City of Twin Falls,* 81 Idaho 176, 338 P.2d 778. Appellant does not question the constitutionality of the ordinance authorizing the action taken; all he questions is the reasonableness of its application. If the exercise of the authority under such an enactment is reasonable and not arbitrary, any injury occasioned thereby must be considered a servitude inherent under our system of government, and damages from such injury must be considered as *damnum absque injuria. Id.* at 52, 390 P.2d at 295.

If one were to accept the majority's statement as gospel, Boise City, acting with unfettered and judicially unreviewable discretion, could vacate all of Fairview Avenue, provided that all of the abutting owners agreed to it, and other vastly affected

city property owners would be unable to get into the courts.

Finally, I am equally concerned with the majority's blase' declaration that the city's lease of the Cedar Street Bridge cannot be judicially inquired into: "Courts may not inquire into motives behind legislative enactments or resolutions except as to acts which are purely ministerial." Majority slip op., pp. 1262–1263. Footnote 1 of the majority opinion does advise that the lease was for 99 years, via a 40-year term and an option to renew for additional years—all 99 years to require payment of $1.00 each. For the first forty years, *no* percentage of rental receipts was required. The city did not expose the lease proposition to competitive bidding.

Another city property-owner and taxpayer—owner or part owner of four other properties on First Avenue (which connects to the Cedar Street Bridge)—submitted his affidavit with approximately 100 signatures urging the city council retain the bridge as part of the public highway system. Alternatively, he offered to become lessee at $25,000 per annum, fixed, on a conceded value of the raw real estate at $400,000. R., p. 129.

## II.

A major and pertinent concern which probably plagues me alone is created by paragraph 22 of the lease which was entered into:

> In entering this Lease, tenant well understand that one of the alternatives (Sand Creek Alternative) for a U.S. Highway 95 Bypass of the City of Sandpoint would be adjacent to the East of the leased property on the present Burlington Northern right of way ....

My recollection is that this bypass would commence at a point on the fill which connects Sandpoint proper to the two long concrete bridges over Pend Oreille River, one built approximately 25 years ago and the other five years ago, and parallels the Burlington tracks going north, on the westerly side. That proposed bypass would indeed be adjacent to the east end of the

Cedar Street bridge. Unmentioned in the lease, in the complaints, or anywhere is that in contemplation of the building of the first concrete bridge, the initial start of the Sandpoint bypass, is that at *public meeting* in Sandpoint, as required by statute, the State of Idaho Department of Highways committed itself to the people that in the eventual finishing of the bypass, its plans called for construction of an all-new Cedar Street bridge with access onto that bypass highway. Another and different City of Sandpoint administration, however, worked some sort of a transaction whereby the city purported to excuse the state from its commitment to the people. That issue has never been litigated.

Under the authority of *Sandpoint v. Doyle,* 14 Idaho 749, 95 P. 945 (1908), the plaintiff, and all residents of Sandpoint, would appear to have a very considerable interest in maintaining ownership of that bridge on the possibility that it will one day provide a valuable and almost indispensable access onto the bypass, and its loss leaves but one bridge providing access from 95 percent of all Sandpoint to the city frontage on Lake Pend Oreille. A great concern has to be felt for the disruption of all waterfront activity on Lake Pend Oreille should the sole remaining bridge become obsolete—which was exactly what occurred with respect to the first long concrete bridge the state built 25 years ago at the same time it was aiding the city in the total construction of the sole remaining bridge which is used as a bridge and not a mall.

The plaintiff should have been allowed to pursue his claims in court, and not tossed out on such a flimsy excuse as lack of standing. Hopefully, the majority will reconsider and concede that *Canady* cannot be used as it is being used—to deprive the plaintiff of his access to the courts. By no stretch of the most elastic of consciences can it be said that the standing discussion in *Canady* was anything but dicta.

The case should be reinstated, and plaintiff should have leave to bring in the State of Idaho in order to examine into what may have been an unlawful transaction between

the city and the Transportation Department.

## ADDENDUM

My thoughtful analysis of the actual holding of the *Canady* case did not produce any stampede of other Court justices rushing to embrace it. Nothing daunted, on turning to perhaps my tenth perusal of that case, my eyes wondrously focused on something that has for all of these many years eluded my observation. The Court in those days prepared the syllabus which was used by the publisher of the Idaho Reports, and it was careful to emphasize what it was holding by, of all things, making use of the word "held" and italicizing it at the same time.

(Syllabus by the court.)

1. Where by ordinance a town or village vacated certain streets and alleys in the year 1900, with the understanding that the C. Lumber Co. would establish and maintain a large lumber manufacturing establishment upon certain blocks owned by it in the city of C., and said company proceeded and expended in the establishment of said plant on said blocks and on parts of the streets vacated, over a hundred thousand dollars and the plaintiff had actual notice of the passage of such ordinances and the expenditures of money in the construction of said plant, and made no objection thereto until the commencement of this action on June 15, 1909, *held,* that she is estopped from maintaining this action.

2. Under the provisions of subd. 27, par. 15, of sec. 2238, Rev.Codes, a municipality has the authority to create, open, widen or extend any streets, avenue, alley or lane or annul, vacate or discontinue such streets, alleys, etc., whenever it is deemed expedient for the public good.

3. Whenever a street or alley is vacated or discontinued it reverts to the abutting property owner.

4. A municipality in certain cases has the power to vacate portions of streets and alleys for the purpose of devoting such vacated streets or alleys to private uses.

5. The right to vacate a street or a part thereof is largely in the discretion of the body possessing that power, and such body may determine as to the public convenience and necessity of such discontinuance, and where there has been no glaring informality or illegality in the proceedings, its judgment should not be disturbed.

6. The proceedings in relation to the discontinuance or vacation of streets or alleys are not void on account of such board or body not having provided by ordinance some method or manner for determining any damages that might occur to property owners because of such vacation or discontinuance.

7. One whose property does not abut on the part of the street vacated by ordinance cannot maintain an action to enjoin the enforcement of the ordinance though he in common with others may be inconvenienced by such vacation.

8. While such vacation may cause one to travel further and in a more circuitous route in order to get to the business portion of the city, that is an inconvenience different in degree only from that suffered by other persons, and it furnishes no ground for injunctive relief.

9. One owning land not abutting on the part of the street vacated cannot recover damages, although such vacation may tend to lessen the value of his land.

10. The general doctrine is that one cannot maintain a private action for loss or damage which he suffers in common with the rest of the community, even though his loss may be greater in degree.

11. If the street so vacated or discontinued cuts off the property owner's ingress to or egress from his property, that would be a loss or damage not common to the rest of the community and he would have an action for the recovery of whatever damages he might sustain by reason of such vacation.

12. *Held*, that this action is barred by the statute of limitations. *Canady, supra*, 21 Idaho at 77–78, 120 P. 830.

Exactly as I wrote earlier, the plaintiff in *Canady* was (1) *held* estopped by reason of her laches, and (2) *held* barred by the statute of limitations. West Publishing, in the Pacific Reports, also used that same syllabus by the Court and added to it a thirteenth headnote prepared by its editorial staff, which merely amplified on the Court's twelfth headnote by stating the delay of nine years and the applicable statutory limitations which barred the action. 120 P. at 830–31.

### ON DENIAL OF PETITION FOR REHEARING

BISTLINE, Justice, voting to grant rehearing.

The plaintiff-appellant has petitioned for a rehearing, but has limited the request of the petition to a single issue. No complaint is registered to the Court's opinion insofar as its very first paragraph stated that: "The district court held, in sum, that Bopp had failed to state a cause of action both with regard to the vacation ordinance and the subsequent lease." Slip op., p. 1261. Apparently, notwithstanding the error in that statement, and the majority's misplaced reliance on the *Canady* case, what any three members of the Court declare to be so—is so, or, at least it becomes so even if it is not so. The district court did not hold that a cause of action was not stated, but made it extremely clear, even to a second grader one would think, that because of *Canady* Mr. Bopp did not possess the requisite standing to bring the lawsuit. Had he been an owner abutting on the Cedar Street Bridge, then he would have had standing. Lack of standing was presumably a defense which had not been pleaded in the first action brought before Judge Prather—wherein Mr. Bopp was successful. Lack of standing and failure to state a cause of action are two different animals, and the majority opinion has done

Mr. Bopp a great disservice by having seized on one part of the *Canady* opinion, to wit, "a property owner has no cause of action against a municipality for damages to his or her property by the vacation of a public highway where no part of his property abuts upon the portion of the highway vacated....," and artfully ignoring a passage which appeared two pages earlier in the *Canady* opinion:

The next question presented is that as the appellant is not an abutting owner on either of the parts of the streets or alleys vacated and discontinued, she therefore cannot maintain this action to enjoin enforcement of such ordinances, though she, in common with others, may be inconvenienced by the enforcement of such ordinances and compelled to travel farther to get to the business portion of the city.[1] *Canady, supra*, 21 Idaho at 89, 120 P. at 833.

The district court, Judge Magnuson, and the defendants themselves, recognized full well that the *Canady* opinion centered on standing. It is both interesting and demoralizing to read pertinent portions of Judge Magnuson's excellent Memorandum Decision allowing summary judgment against Mr. Bopp, as compared to the majority's distortion of that decision—pertinent portions of which are:

On January 20, 1983, the Company filed its Answer to the Complaint, reciting as its first affirmative defense that Plaintiff failed to state any claim against Defendant upon which relief could be granted, and as its second affirmative defense, the Plaintiff lacked *requisite legal standing* to maintain this action....

....

It appears to this Court that Plaintiff's case is premised upon the invalidity of the vacation of the bridge property by Ordinance 767. Therefore, the Court will first address the claim the Plaintiff does not have *standing* to maintain this action. The general rule is that only those who sustain some special or peculiar inju-

1. As will be seen, *infra*, it is this very paragraph which was the backbone of the district court decision. *See*, p. 1272, first paragraph, quoting from the district court decision.

ry, differing in kind and not merely in degree from that sustained by the general public, are entitled to complain of a street vacation.

. . . .

In 1911, our Idaho Supreme Court in the case of *Canady vs. Coeur d'Alene Lumber Company and City of Coeur d'Alene*, 21 Idaho 77 [120 P. 830], considered a situation quite similar in many respects to our present case, with the exception that the *Canady* case involved a delay by the Plaintiff in bringing the action which is not a factor in our present case.

. . . .

The Supreme Court then stated (on page 89 of the *Canady* case):

"The next question presented is that as the appellant is not an abutting owner on either of the parts of the streets or alleys vacated and discontinued, she therefore *cannot maintain* this action to enjoin enforcement of such ordinances, though she, in common with others, may be inconvenienced by the enforcement of such ordinances and compelled to travel farther to get to the business portion of the city. . . ."

. . . .

The *Canady* case was decided in 1911, and has never been overruled. Those portions of the case related to the statute of limitations and the delay of the Plaintiff to bring her suit have been distinguished in subsequent cases; however, this Court was unable to find any instance where our Supreme Court has changed the requirement that the Plaintiff must own land abutting the vacated right-of-way before he has *standing* to object to the vacation ordinance in Court.

. . . .

The substance of the Idaho rule involving *"standing"* in street vacation cases is the Plaintiff is required to allege and show that he is specially damaged or affected by the action of the City in vacating and leasing the subject property.

. . . .

After reviewing the cases cited by Plaintiff, this Court is unable to find any therein presenting compelling reasons which would allow Plaintiff *standing* in this contest of the Sandpoint right-of-way vacation. Instead, the cases cited appear clearly distinguishable from our present case and the *Canady* case. Therefore, this Court concludes the Plaintiff herein does not have the *requisite standing* upon which to assert his case against the City regarding its Ordinance 767.—The *Canady* case was a unanimous decision by the Court and established well reasoned guidelines for the determination of *standing* in street vacation cases. Our Supreme Court has not seen fit to vary from this position in subsequent cases and therefore the *Canady* Decision is considered binding upon this Court.

. . . .

. . . The Plaintiff herein is not an owner of abutting property and does not have a legal interest in the reversion of the land, whether it be to an abutting owner or to the City.

This Court concludes that Plaintiff does not have *requisite standing* to challenge the validity of the City's lease to the Company based upon Plaintiff's challenge to the underlying Ordinance 767, which vacated the 32 foot strip. Plaintiff shall not be allowed to collaterally attack the vacation ordinance through an attack upon the subsequent lease of the vacated land by the City. Plaintiff should not be allowed to do indirectly that which he does not have the *requisite standing* to do directly. . . .

. . . .

This Court has considered giving the Plaintiff an opportunity to amend his pleadings in order to make the requisite showing of *standing* to challenge the validity of Ordinance 767, but this Court has concluded this would be fruitless as the Plaintiff did not own property abutting the vacated parcel. R., Vol. 2, pp. 245–53 (emphasis added).

Obviously the author of the majority opinion had read the exhaustive written decision of Judge Magnuson, and equally obvious, was well aware that the defendants had challenged Mr. Bopp's standing on the basis of the *Canady* case. And yet, on ten or more rereadings of the majority opinion, I am unable to find that the word "standing"—a word of the art—is mentioned even one time.[2]

It would be a bright and sunny day for the science of jurisprudence in this state if only three members of the Court were to acknowledge the unjust and unfair way in which the Court's opinion portrays the decision of Judge Magnuson, and, of their own volition and motion vote to grant a rehearing in full, so that this case be again examined to see if *Canady* does have any precedential effect where (1) it's statement on standing was a gratuity; (2) even as a gratuity it is now outdated, and; (3) the district judge by his own pen was highly inclined to allow Mr. Bopp the opportunity to amend in order to show the standing which he believed necessary to reach the merits. There is no doubt in my mind that, had Judge Magnuson observed from the Supreme Court's headnoting to *Canady*, that the standing discussion was not holding, he would not have felt as outright bounden by it as he well expressed himself in that regard. I so vote for a full rehearing.

---

2. In searching the majority opinion, it was discovered that its footnote 1 had earlier escaped me; accordingly, it becomes necessary to delete the last two sentences of Part I of my February opinion and make an appropriate substitution.